203 So.2d 124

**FIRST NATIONAL BANK OF BIRMING-HAM, Trustee et al.**

**v.**

**Fred ADAMS et al.**

**6 Div. 356.**

Supreme Court of Alabama.

Oct. 12, 1967.

Cabaniss, Johnston, Gardner & Clark, Drayton T. Scott and Meade Frierson, III, Birmingham, for First Nat. Bank.

Bradley, Arant, Rose & White, Wm. Bew White, Jr., Harry R. Teel and John N. Wrinkle, Birmingham, for St. Regis Paper Co.

Frank M. Bainbridge, of Bainbridge & Mims, Birmingham, for T. M. McClellan, Jr.

Sam C. Pointer, Jr., of Brown, Pointer & Pointer, Birmingham, for L. R. Crumley and others, interveners, appellants.

McCollough & McCollough and D. H. Markstein, Jr., Birmingham, for appellees.

SIMPSON, Justice.

In December, 1945, Birmingham Paper Company, an Alabama corporation, entered into an agreement entitled Birmingham Paper Company Employees Profit Sharing

Trust, in which the First National Bank of Birmingham was named as trustee. This agreement continued in effect until 1958 when a new agreement was drawn which for all purposes here pertinent restated the old agreement and amended the same in particulars not here involved. All references herein to "the plan" or "trust agreement" refer to the 1958 instrument.

In 1958 with the adoption of the new agreement two wholly owned subsidiaries of Birmingham Paper Company, Nifty Manufacturing Company and Nifty Tablet Manufacturing Company, adopted the trust for the benefit of their respective employees. The agreement in essence provided for a profit sharing plan for the benefit of employees. of Birmingham Paper Company and its subsidiaries.

The trust instrument provided for a "waiting period" of two years continuous "service in the employ of the Company * * * or of a successor corporation which succeeds to the business of the Company" (Article I, Section 10), at which time employees could become members of the plan by filing with the trustee a request for participation. Membership was optional with the employee, but by requesting participation, he evidenced "his assent to the provisions of this agreement and of any amendment thereto" and became "bound then and thereafter * * * by the terms of (the agreement) including all amendments thereto."

· Under the terms of the agreement the Company was to contribute annually to the trustee "subject to such amendments as may be made hereto from time to time" a prescribed portion of its net earnings (up to 15% of the compensation paid by it during the year to the members) plus such additional amounts as the directors might authorize. Separate accounts were set up and maintained by the trustee for each member, into which was credited his pro rata share of the Company's contributions for that year. However, though the funds were allocated to members, title to the funds remained with the trustee which had broad powers to invest them. Income received on the corpus was likewise credited annually to the account of each member.

Benefits under the plan were made payable (for our purposes) when the employee terminated his employment with the Company. The circumstances of an employee's termination of employment plus the amount in his account determined the amount, commencement and form of benefits to which he was entitled. If severance of employment were due to an employee's death, or total disability, his entire account became payable to him or to his designated beneficiary, either in a lump sum or in monthly installments. If severance of employment were due to retirement after attaining 65 years of age or with the Company's consent after reaching 55 and having completed 10 years of employment, his entire account became payable either in a lump sum or in monthly installments or by an annuity. If an employee resigned or was discharged before age 65, the "vested" portion (as defined in the plan and not here material) is set aside and held for him by the trustee or used to buy a deferred commercial annuity, with actual payments in either event not to commence until he subsequently died or became totally disabled or reached age 65.

All contributions to the plan were made by the Company. It reserved the right under the plan to discontinue contributions, the right to amend, and with the approval of the trustee, to terminate the trust; but no such action was to impair the vested rights of the members or to entitle the Company to any part of the trust corpus or income.

The trust agreement contained the following provisions which are here material:

Article I, Section 3: "The term 'Company' shall mean Birmingham Paper Company and shall also include its successors and assigns or any subsidiary corporation which may become a party to this Trust Agreement by executing an ap-

propriate instrument in writing indicating its intention to do so * * *."

Article I, Section 10: "The term 'continuous service' and like expressions used herein shall mean service in the employ of the Company, or hereafter in the employ of a successor corporation which succeeds to the business of the Company * * *."

Article II, Section 3: "Title to the Trust Fund shall be and remain in the Trustee until termination of the trust hereby created and no Eligible Employee or Member shall have any legal or equitable rights or interest in the Trust Fund except to the extent that such rights or interest may be expressly granted under the provisions of this Trust Agreement. * * *"

Article VII, Section 1: "* * * In the event that the Company elects to make no further payments all accounts in the trust shall immediately become fully vested in the respective Members, but no Member shall be entitled to any payments except as provided under Article IV and V of this trust. In the event the Company elects to make no further payments there shall be no new Members in the Trust."

Article IX, Section 2: "This trust shall terminate upon the happening of any one of the following events:

"(a) The bankruptcy, insolvency or dissolution of the Company;

"(b) The adoption by the Board of Directors of a resolution to that effect, approved by the Trustee;

"(c) In the event the Company is no longer in existence the Trustee shall have the power to terminate the trust when in the opinion of the Trustee it would be to the best interests of the Members of the Trust."

With this background of the content of the trust agreement, let us now look to the developments which led to this litigation.

On March 16, 1960, Birmingham Paper was merged into St. Regis Paper Company, a New York corporation, pursuant to the laws of Alabama and of New York as those laws relate to mergers. The plan of merger provided:

"* * * St. Regis Paper Company shall be and become the owner of and possessed of all the assets, privileges, immunities, powers, franchises and authority of Birmingham Paper Company * * * and all of such assets, business, properties, rights, privileges, immunities, powers, franchises and authority of said Birmingham Paper Company theretofore owned or held by it shall be transferred, conveyed, assigned, distributed to and received by St. Regis Paper Company without the necessity of any further acts, deeds, bills of sale or other instrument of transfer, conveyance or assignment whatsoever."

Subsequently, on April 28, 1960, California Nifty and Texas Nifty (the two subsidiaries of Birmingham Paper hereinabove mentioned) were likewise merged into St. Regis.

Following the merger of Birmingham Paper and its subsidiaries into St. Regis, business continued as before; the employees of Birmingham Paper and its subsidiaries continued in the employ of St. Regis, performing their old jobs. St. Regis assumed supervision and control over those aspects of trust administration which involved decisions by "the Company" as used in the trust instrument. Prior to the merger Birmingham Paper had fixed and accrued a contribution for the year 1959 in the amount of $153,312. This amount was paid in 1960 by Birmingham Paper. For the year 1960 St. Regis contributed to the plan some $165,000.

At the time of the merger, and for some years prior thereto, St. Regis had a

profit sharing plan of its own. Under its plan a one year "waiting period" was required before employees became eligible to participate. Following the merger and for the year 1960 St. Regis made to the Birmingham Paper plan the aforementioned contribution in the amount of approximately $165,000. As employees qualified for participation under the St. Regis plan (or left the employ of St. Regis) contributions by St. Regis to the Birmingham Paper plan dropped in subsequent years to $10,000, then to $7,000, then to $2,500, and finally for the year 1964 to $100 as only one employee remained who had not become qualified for participation under the St. Regis plan. In other words, as old employees of Birmingham Paper who were participants in the Birmingham Paper profit sharing plan became eligible to participate in the St. Regis plan, contributions on their behalf to the Birmingham Paper plan were discontinued and instead contributions on their behalf were made to the St. Regis plan.

The contributions by St. Regis to the plan were effected by a series of amendments. For example, immediately following the merger and on April 13, 1960, St. Regis (and the Nifty companies which had not yet been merged into St. Regis) adopted an amendment electing to make no further contributions to the trust except to pay the balance of the 1959 contributions. By this amendment all accounts were fully vested in the participants as of January 1, 1960. This amendment eliminated the provisions of Article IX, Section 2, set out above, relative to termination of the trust upon dissolution of the Company.

On December 8, 1960, St. Regis amended the trust to provide for further contributions to the trust for the benefit of employees not participating under the St. Regis plan. This amendment included the provision for the $165,000 contribution referred to above.

Following the mergers and for some three and one-half years the First National Bank of Birmingham continued to act as trustee as provided for in the plan as it had done in the past, including the distribution of benefits to members or their beneficiaries when and as their employment with St. Regis was terminated. Of course after the 1960 amendment all accounts were treated as vested.

In December, 1963, this case was commenced on behalf of some 150 employees of Birmingham Paper Company (now working for St. Regis) who alleged that they were participants in the profit sharing plan established by Birmingham Paper against the First National Bank as trustee of the Birmingham Paper Company profit sharing plan. The complaint alleged termination of the plan by merger of the company (including the two subsidiary companies) into St. Regis Paper Company and prayed, inter alia, the immediate distribution to these employees of the trust funds rather than a deferred distribution as provided for in the plan. The original bill was amended several times to add additional parties complainant including the union representing some of the employees, and to add St. Regis as a respondent. It was further amended to allege that the suit was brought not only on behalf of the named parties complainant but also on behalf of all participants in the plan.

Ultimately the cause was submitted on the bill as amended, answers as amended, various exhibits, testimony of a great many witnesses, etc. Following the submission a decree was rendered finding that the trust was terminated by the merger and ordering a reference to determine how the assets of the trust should be distributed. St. Regis and the First National Bank applied for a rehearing. Petitions for intervention were filed on behalf of several members (employees of Birmingham Paper and now St. Regis) all of whom the named complainants purported to represent as members of the class sued for. These intervenors claimed that they were inadequately represented by the complainants since they did not desire the relief sought in the bill. The court after hearing allowed the bill

for intervention. Following several amendments, additional hearings, etc. St. Regis filed a cross bill seeking recovery of contributions made by it to the plan subsequent to the date upon which the court found that the trust had terminated.

A final decree was entered on February 15, 1966, which reconfirmed the original decree except to the extent modified in the final decree. The final decree in the cause again held that the plan had been terminated by the merger of March 16, 1960, of Birmingham Paper into St. Regis and that all members of the plan were entitled to an immediate distribution of the assets of the trust as of December 31, 1960. An appeal was taken from this decree by all respondents and the intervening employees.

The trial court held in part as follows:

"The Court * * * finds that the principal issue in this case is whether the profit sharing trust in question was terminated by the merger of Birmingham Paper Company, Nifty Tablet Manufacturing Company and Nifty Manufacturing Company into St. Regis Paper Company in March and April of 1960. This in turn depends upon whether these mergers constituted a 'dissolution' of those companies as that term is used in Section 2 of Article 9 of the trust agreement, or whether on the contrary St. Regis Paper Company was the 'successor' to the merged corporations as that term is used in Section 3 of Article 1 of the trust agreement.

"This Court is of the opinion that in construing the trust agreement * * * the Court must attempt to give effect to the intentions of the parties at the time of the execution of the agreement. It seems obvious that the 'successor' to the Birmingham Paper Company as used therein was intended to refer to a succeeding company which would contribute to and continue the profit sharing plan. The entire tenor of the trust contemplated contributions to the trust out of the profits of Birmingham Paper Company.

When Birmingham Paper Company was merged into St. Regis, it could no longer have any profits because it was operated as a division of St. Regis. Furthermore, St. Regis immediately notified all parties that the plan was discontinued and there would be no further contributions to the trust after the year 1960 and that the accounts for all participants were fully vested in those participants effective January 1, 1960."

Later on reconsideration the trial court decreed:

"Birmingham Paper Company was merged into St. Regis Paper Company on March 16, 1960, after which date Birmingham Paper Company had no more employees and no more profits; which merger constituted a dissolution of Birmingham Paper Company and the termination of the plan as to the employees of that company. * * * (T)he plan should be considered as terminated effective December 31, 1960."

This appeal is from the foregoing decree.

■ The trial court correctly concluded that the function of the court in a case such as this is to construe the language of the instrument to give effect to the intention of the settlor where possible.

In that connection is St. Regis the "successor" to Birmingham Paper Company insofar as that word is used in the trust instrument? The trial court concluded that it was not. As far back as 1908 this court in Southern Steel Co. v. Hopkins et al., 157 Ala. 175, 47 So. 274, 20 L.R.A., N.S., 848, 131 Am.St.Rep. 20, 16 Ann.Cas. 690, held that the resultant corporation following a merger of a constituent corporation into it was "the successor in law of the merged companies". Also in Title Guarantee Loan & Trust Co. v. Alabama By-Products Corporation, 214 Ala. 486, 108 So. 353, we cited with approval the following from 14a Corpus Juris 1069, § 3657:

" 'When a consolidation results in the creation of a new corporation, the usual effect of the consolidation statutes is that the consolidated corporation succeeds to the rights, powers, privileges, and immunities of each of the original corporations, except so far as otherwise provided by the act of consolidation or by other applicable statutory or constitutional provisions, or by the limitations of the consolidated corporation's charter. The consolidated corporation takes the rights, powers, privileges, and immunities of the constituent corporations subject to the laws applicable to corporations in existence at the time of consolidation.' "

Indeed, our merger statute, Title 10, § 21 (71), Code 1940, is consistent with this general statement. It provides:

"Upon the consummation of any consolidation or merger  *  *  * all property, rights, privileges, powers and franchises, and all and every other interest shall thereafter be as effectually the property of the corporation resulting from or surviving such consolidation or merger as they were of the respective constituent corporations  *  *  *."

▮▮ We think it is clear under the Alabama decisions and indeed the decisions of most if not all jurisdictions, that the surviving corporation in a merger situation is the successor to the constituent corporation. If it is not the successor to the constituent corporation what is it with regard thereto? Indeed, what other than the surviving corporation could the settlor have intended by the words "service in the employ of a successor corporation which succeeds to the business of the Company" as that language is used in Article I, Section 10 of the trust instrument? Did not St. Regis succeed to the business of the Company as therein defined following the merger?

In International Paper Company v. Curry, 243 Ala. 228, 9 So.2d 8, citing Alabama City G. & A. R. Co. v. Kyle, 202 Ala. 552, 81 So. 54, it was observed:

"An inspection of the [merger] agreement and acts of consolidation to form this defendant corporation shows no limitations or restrictions on the powers possessed by the old corporations; hence the new corporation possesses all the powers which each and all of the old corporations possessed, without any restrictions by the way of agreement."

So here an inspection of the merger agreement between Birmingham Paper Company and St. Regis shows that St. Regis has all of the powers which Birmingham Paper had.

▮▮ We are clear to the conclusion then that St. Regis was and is the successor to Birmingham Paper Company as that term was used in the trust instrument.

▮▮ Further, on the question of dissolution, the trial court concluded that the Alabama decisions required a finding that the Birmingham Paper Company was "dissolved" by the merger as that term was used in the agreement. We disagree that the decisions of this court require that conclusion. On the contrary, as noted by the Fifth Circuit Court of Appeals in an opinion in which we concur, while a merger terminates the constituent corporation for some purposes, it is not dissolved as that process is described in the Code, Title 10, § 104 et seq. Alabama Power Company v. McNinch, 68 App.D.C. 132, 94 F.2d 601. Further, as noted in International Paper Company v. Curry, supra, the constituent corporation lives as a component part of the surviving corporation insofar as the rights, franchises and privileges enjoyed by the constituent corporation are concerned. In other words, while the constituent corporation may no longer survive for some purposes, the rights and privileges which it enjoyed under the statutes of Alabama survive the merger and inhere in the surviving corporation following the merger.

■ In this case the trust agreement clearly and unambiguously stated that the trust was to terminate upon: dissolution, insolvency or bankruptcy of Birmingham Paper Company or its successors and assigns. None of these events has occurred either as to Birmingham Paper Company or as to St. Regis. We clearly conclude that the trust has not been terminated because of the dissolution of the company as that expression is employed in the agreement.

The trial court expressly placed a great deal of emphasis on the fact that St. Regis discontinued making contributions to the trust fund as established by Birmingham Paper Company. However, in so doing St. Regis was doing no more than the instrument permitted Birmingham Paper to do at any time, Article VII Section 1 clearly and unambiguously provided that in the event the company elected to do so it would discontinue making contributions to the fund in which event the amounts theretofore placed in the plan would be vested in each member and held by the trustee until such time as each member became entitled to the funds under the provisions of the plan. As we have seen by the statute and cases above, the successor to Birmingham Paper, St. Regis, succeeded to all the rights and powers which Birmingham Paper had under this plan. Would it have been contended that the plan was terminated when Birmingham Paper elected under the provisions thereof to make no further contributions thereto?

As the trial court recognized, it is the established law that in construing any trust instrument the intention of the settlor is controlling where it is possible to effect that intention. Let us examine the circumstances which seem to throw light on the intention of the settlor here. We think Birmingham Paper intended to establish a fund which would provide benefits for faithful employees upon their death, disability, or retirement. It is without significance that it might have arrived at this intention because it was to its advantage from a tax standpoint to do so. To effect this intention, annual contributions were to be made to the trustee and to be held for the benefit of the employees. The settlor provided that contributions could be discontinued at any time in which event the trustee was instructed to hold the funds theretofore contributed for the benefit of the employees and to distribute such funds to each of them as he or she reached retirement age, became disabled, or died. St. Regis has done exactly this. It has elected to discontinue the annual contributions. Birmingham Paper Company had the power and right to do so at any time under the provisions of the plan. We find nothing in the plan which required that contributions continue. Let us assume that Birmingham Paper Company had elected to make no further contributions to the plan. This might have been a feasible course of action had membership in the plan been reduced to a few people, which could have occurred at any time since participation was voluntary on the part of each employee. Further, forfeitures resulting by employees quitting might have occurred so that there was sufficient funds in the trust to provide for the benefits conferred without additional contributions. We do not reach the conclusion of the trial court that continuing annual contributions was necessary to keep the trust from terminating.

■ There is one further reason we cannot agree with the trial court. It concluded that the trust had terminated because Birmingham Paper had been "dissolved". It construed the term "dissolution" as used in the trust agreement to include the legal effect of a merger. The word "dissolution" in corporate law has a special and technical meaning. This agreement was drawn by one learned in the law. If the settlor had intended that the trust was to terminate at such time as the Company merged with another, it could

have said so. The expression "merger" was known to settlor and used in its legal sense in other provisions of this trust agreement. We think that the word "dissolution" as used in the instrument was used in its legal sense. One of the rules of construction long employed by the courts in these cases is stated at 90 C.J.S. Trusts § 161, as follows:

"In construing a trust instrument, where it is clear that words which are capable of a technical meaning are used in that special sense, they will be so interpreted throughout, unless the contrary clearly appears.

"Legal terms in a trust instrument are ordinarily to be given their legal meaning unless obviously used in a different sense; legal phraseology should not prevail over practical intendment.

"Where the instrument has been drawn by one skilled in the law, the presence of legal technical terms is an indication that the words are to be accepted in accordance with legal definition * *."

In this case the trust was drawn by one skilled in the law. We think he used legal terms in their legal sense. Clearly he was aware of the technical difference between dissolution and merger of the Company as therein used. He provided for the termination of the trust upon dissolution. We are not prepared to read into the instrument a provision for its termination upon merger.

We conclude that the trial court erred in finding that the trust was terminated and its decree so holding is reversed and the cause is remanded.

Reversed and remanded.

LIVINGSTON, C. J., and MERRILL and HARWOOD, JJ., concur.